State ex rel. R. R. Co. vs. Smith.

No. 13,426.

STATE EX REL. TEXARKANA, SHREVEPORT AND NATCHEZ RAILWAY
COMPANY VS. E. M. SMITH.

## SYLLABUS.

A writ of *mandamus* will not lie unless the action desired is of absolute obli-
gation on the part of the person sought to be coerced; and the relator
must show not only a clear legal right to have the thing done, but to
have it done in the manner and form in which he desires the respondent
to perform it.

The act must be clearly prescribed and enjoined by law; and the duty must be
plain and positive. This is the sense of all the authorities.

A board of levee commissioners created by statute to subserve a public pur-
pose, and to effectuate same is given certain public lands for its adminis-
tration and use, have no power in law to make a donation thereof to a
private corporation; and no right by *mandamus* to compel its president
to sign an act carrying same into effect.

APPEAL from the First Judicial District, Parish of Caddo—*Land,
J.*

*Leonard & Randolph* for Plaintiffs, Appellees.

*D. T. Land* for Defendant, Appellant.

## STATEMENT OF THE CASE.

The opinion of the court was delivered by

WATKINS, J. This is a proceeding by *mandamus* to compel the
respondent, in his capacity of president of the Board of Commission-
ers of the Caddo Levee District of Louisiana, to obey the resolution of
said board, and to sign, as such president, a deed to the relator for the
lands described in accordance with and embodying the terms and pro-
visions of same.

The respondent resisted the allowance to relator of the relief sought,
and filed an extended return.

Upon the issues thus joined, the judge *a quo* made the writ of *man-
damus* peremptory; and thereupon the respondent prosecuted this ap-
peal.

Relator's petition avers that in October, 1898, through its president,

a proposition was submitted in writing to the Board of Commissioners of the Caddo Levee District, a corporation created by and existing under the laws of this State, to purchase all the lands of said levee board lying above Shreveport, and contiguous thereto, aggregating in quantity about twenty thousand acres—as particularly described in a list of same annexed to and made a part of the petition—for the price of three cents an acre; binding said corporation to pay taxes on said land for the period of not less than five years from the date of sale, and to have its railroad from Shreveport completed within that period, or, otherwise, the lands were to revert to said board.

That thereupon the said board received and considered said proposition, and appointed a committee from among its members to investigate and report upon said proposition; and that said committee had, by a majority, reported favorably on said proposition, and recommended its acceptance.

That at a regular meeting of said board, said majority report was received and adopted, and by a resolution of said board, said proposition was accepted, and said property was sold, transferred and delivered to relator, for the price stated—the respondent being instructed to make and sign without delay a deed to said lands upon the payment of the purchase price.

The following is a pertinent paragraph extracted from the relator's petition, to-wit:

"It being provided by said resolution that the consideration of said sale is not only the three cents per acre, but the advantages to the levee district of the building of the Texarkana, Shreveport and Natchez Railway by said railway company, between Shreveport and Texarkana, through the alluvial section of Caddo parish, and the speedy listing of said lands for taxation; it being stipulated in said resolution, that on the failure of said railway company to build its road to the corporate limits of Shreveport within two years from date of resolution, the said vendee is to retransfer the lands to the levee board and receive back the price; and further, that on failure to pay taxes on said lands, same shall *ipso facto* revert to the board. A copy of said resolution is hereto annexed and made a part hereof, &c."

Relator's petition further represents that the defendant accepted the aforesaid resolution, and filed with said board its acceptance thereof in writing.

The petition further represents that, subsequently, relator caused to

be prepared a deed to said lands, in accordance with said resolution, and embodying therein the provisions thereof, and presented same to the respondent in the presence of a notary and two witnesses, and tendered the full amount of the purchase price, and requested him to sign said deed as he was instructed to do by said resolution; and that the respondent refused so to do.

Thereupon, "relator represents, that it was the official duty of said president to obey the instructions given him by the board by the resolution aforesaid. That such instructions the said board had the power and right to give him as its officer. That the duty imposed upon him was purely ministerial; that the said president had and has no discretion in the premises, and is bound to sign such deed as instructed by said board."

After tendering certain exceptions, the respondent makes return in substance, that it is his plain duty to refuse to sign the deed as demanded by the relator, and that he has refused to sign the same, because the resolution of a majority of the members of the board of commissioners of the Caddo Levee District, instructing him to sign same, is illegal and null, for the following reasons, viz:

"1. Because said board is the representative of a public corporation, known as the Caddo Levee District, created by an act of the legislature of the State of Louisiana, for the purpose and object of reclaiming all the alluvial lands in said district from overflow, and in aid of said public enterprise the State of Louisiana donated the lands set forth in (relator's) petition 'to said levee district for said object and purpose; and said lands or their proceeds are necessary to the carrying out of the objects and purposes for which said district was created; and it is the duty of said board to obtain therefor the highest market value."

2. Because said pretended sale of said lands embraces all of the lands in said district above Shreveport, now owned by said levee district, and is a disguised donation by said levee district to said (relator) of said lands; and said levee district has no power or authority in law to donate its lands or property to said railroad.

3. It further returns that said lands are now worth, and were well worth to the levee district, when the resolution of the board of commissioners was passed by a majority thereof, at least thirty (30) cents per acre; and that a *bona fide offer* for said lands was made at that price

to the board by a responsible party, which was refused by the majority of said board, and that of the relator accepted.

There are additional grounds of defense that are set up in the return which need no present mention; and it is concluded with the statement that respondent, in refusing to sign said act, acted in good faith, in the exercise of the discretion vested in him by law, and in the interest of the Caddo Levee District.

For the foregoing reasons, he prays that the relator's demand be rejected, and that he be discharged from the *mandamus*.

The judge *a quo*, in the course of his reasons for making the *mandamus* peremptory, amongst other things, said:

"The resolution of the board accepting the offer of (relator) to purchase the land in question, and directing the president to execute the instrument of conveyance, is, on its face, within the express powers of the board.

"The defenses set up are based on alleged facts *de hors* the record, and are in effect a demand that the sale be decreed null and void; and urged not by the board or any party in interest, but by an officer of the corporation, who, as such, has no interest in the question.

"Such a decree would be *ex parte* and not binding on the board, which is not a party to this proceeding."

He quotes from State ex rel. Banking Co. vs. Auditor, 47th Ann. 1679, the following extract as bearing out the proposition he announced, viz:

"In *mandamus* proceedings against a public officer, involving the performance of official duty, nothing can be enquired into but the question of duty on the face of the statute, and the ministerial duty he is charged to perform."

He also cited State *ex rel.* Crescent City Railroad Company vs. City Engineer, 49th Ann. 676; State *ex rel.* Comerford vs. Mayor, 45th Ann. 269.

Considering the respondent's return in connection with the reasons of the district judge, in the light that is afforded by the ordinance in question and the law under which same purports to have been adopted, we are to consider and determine whether the respondent is authorized (1) to raise the question of the ordinance being in legal effect a donation in disguise to the railroad company, in disregard of the limitation that the law has placed upon the powers of the board of commissioners; (2) to raise the question of a discretion being vested in the board of

374     SUPREME COURT OF LOUISIANA.

State ex rel. R. R. Co. vs. Smith.

commissioners by the law which called it into existence, with regard to the price it should accept for the public lands of which it was given control for the consummation of the purposes specified therein.

In reality the two questions propounded are almost identical; for the right of the board to exercise its discretion as to the price of sale, and to accept the smaller and refuse the larger bid might, under some conditions, involves a question of donation in disguise. Indeed, that is the question which respondent's counsel press upon our attention; and they insist that, under the evidence that is furnished by the minutes and ordinance, the board of commissioners has been tendered a much higher price for the lands than offered by the railroad company at the time of the adoption of said ordinance accepting its bid; and that same were worth much more, then and now.

They refer to the provisions of the ordinance itself to show that the three cents per acre which is mentioned in the deed and ordinance, is not the true or paramount consideration for the sale.

The deed which the respondent is *mandamused* to sign, discloses that twenty thousand acres, and more, were bargained to the relator for the paltry sum of $610.85; and that the minutes of the levee board show that a bid of thirty (30) cents an acre—that is $6000.00 for the whole body of land—was, by a responsible person, offered for the whole of the land, but that said bid was rejected, and that of relator accepted.

These facts are disclosed by the minutes of the official proceedings of the board of commissioners at the date and at the time the ordinance in question was adopted. They do not constitute evidence of matters *in pais,* or those *de hors* the record of the proceedings of the board.

That is not extraneous proof, but *res integrae.*

The recitals contained in the official minutes of the board are referred to as furnishing proof of the illegality of the ordinance of contemporaneous date, in that the board rejected a cash offer of thirty cents per acre and accepted an offer of three cents per acre, because same was, in legal effect, a donation in disguise, and that the board was without discretion to refuse the higher and accept the lower bid.

Thus it is that the question is raised, upon the minutes and resolution of the board of commissioners, whether it was the duty of the respondent, as a member of same and its official head as president, to accept and acquiesce in the action of the majority as binding and obligatory upon him; and to execute a deed to the railroad company of all

the lands the corporation possessed conformably to its provisions, not-withstanding said alleged sale was, in legal effect, a donation on its face and upon the ordinance and the law.

This is not a question between the respondent as president of the board of levee commissioners and the board, with regard to the respective powers that each one possesses over the subject matter under consideration; nor of the duty of the president of the board, as such, to recognize and give legal effect to a resolution that has been adopted by a majority of the board. For it may be, at once, conceded that a majority of the commissioners had a legal right to adopt the ordinance in question, in so far as a mere question of power and authority is concerned; and, in our conception, the judge a quo proceeded no further than this in the reasons he assigns for his decree.

This is a question of right on the part of the majority of the commissioners, under the law, to pass the ordinance in question, if the act of sale was, in legal effect, a donation in disguise.

The ordinance is of the following tenor, viz:

"Be it resolved by the Board of Levee Commissioners of the Caddo Levee Board, That the board hereby accepts the proposition for the purchase of its lands above Shreveport made by Geo. W. Fouke, president Texarkana, Shreveport and Natchez Railway Company, and the board does hereby sell, transfer and deliver with such title as it has to said Fouke, president of said road, all of the said lands in that portion of the levee district, above Shreveport, at the price of three cents per acre, and the president of this board be and is hereby instructed to make the necessary deed without delay to said vendee, and the said vendee to pay the price at the time of signing the deed to the president of this board. The consideration of this sale being not only three cents per acre, but the advantages to the district of the building of the Texarkana, Shreveport and Natchez Railroad by said company, of which said Fouke is president, between Shreveport and Texarkana through the alluvial section of Caddo, and the speedy listing of said lands for taxation. On the failure of the said road to build to the corporate limits of Shreveport, within two years from this date, the said vendee to re-transfer said lands to the board and receive back the price, and at the time of re-transfer, the obligation as payment of taxes to cease. And further, on failure to pay the taxes, as stipulated, the lands shall ipso facto revert to this board.

"All the above to be embodied in the deed to be signed by the president."

"To Hon. Caddo Board of Levee Commissioners: I accept the resolution this day passed relative to your sale of your lands to me.

(Signed) "G. W. FOUKE,

"President Texarkana, Shreveport and Natchez Railway.

"February 1st, 1899.

"*Ne varietur* for identification with act of sale from Caddo Levee Board to T. S. & N. Ry. C., this 3rd day of August, 1899.

"ALLEN RENDALL, Notary.

"*Ne varietur* for identification with notarial act of certificate of tender from G W. Fouke, president T., S. & N. Ry. Co., to E. M. Smith, president Caddo Levee Board, this 3rd day of August, A. D. 1899. "ALLEN RENDALL,

"Notary Public, Caddo Parish, La.

It is quite true that the declaration is distinctly made in the ordinance that the lands were sold to the railroad company "at the price of three cents per acre," but it is also quite as distinctly stated therein, that "the consideration of this sale (is) not only (3) three cents per acre, but the advantages to the district of the building of the Texarkana, Shreveport and Natchez Railroad by said company * * * between Shreveport and Texarkana through the alluvial section of Caddo (parish), and the speedy listing of said lands for taxation."

Special attention is attracted to this stipulation of the ordinance by an averment in the petition, but same is omitted from the written tender of the purchase price which was made by the railroad company in alleged pursuance of the aforesaid ordinance.

The official minutes of the proceedings of the board at the meeting whereat the aforesaid ordinance was adopted, disclose the fact that a minority report of the land committee was made, and that same was to the effect that the said proposition of the railroad company "be rejected, for the reason that (same) is not an offer to buy the lands of the levee board, but one for the donation of said lands by the board in aid of a proposed railroad, and that this board has no authority to make donations of its assets or property."

The minutes further show that this minority report was voted down, and the majority report was adopted.

There is in the record a letter that was written by the president of

TERM OF 1900-1901. 377

State ex rel. R. R. Co. vs. Smith.

the railroad company which clearly shows that such was his appreciation of said ordinance.

Certainly, there is nothing in the law which created the board to justify the pretension that it had the right, or was given the power to make a donation to any person or corporation.

The respondent is the official head of a public corporation which shares to a limited extent the power of the State, but he can exercise no other power than that which is particularly specified in the enabling law; and can do no other act than such as may tend to effectuate the legislative intention and purpose.

It is a familiar principle in jurisprudence that the law deals alone with results, and not with forms, and that maxim is particularly applicable to this case.

And, if we find that the ordinance is, in legal effect, a disguised donation, instead of an intended offer of sale pure and simple, it cannot be the legal duty of the respondent to carry out such an illegal purpose by signing the proposed act; for upon that hypothesis, the signing and delivery of the act would not effectuate the donation, while it might carry to the railroad company a legal title to the land.

Referring to the enabling statute, we find, that the legislature incorporated into a levee district known and styled as the Caddo Levee District, "all that portion of the alluvial lands and all lands subject or liable to overflow in the parish of Caddo," etc.

Sec. 1 of Act 74 of 1892.

It gave the control and management of same to said levee board, and fully vested all of its powers and duties in a board of commissioners to be composed of seven persons.

*Ibid* Secs. 2 and 4.

One of the duties which were imposed upon said board was to "devise and adopt rules and regulations for carrying into effect and perfecting of a comprehensive levee system, having for its object the perfect protection of the entire district from overflow." *Ibid* Sec. 5.

In order to consummate and carry out the aforesaid objects and purposes, a revenue is to be raised by "the levy annually upon all of the property in the said district subject to taxation for levee purposes, a district levee tax of ten mills on the dollar of its assessed valuation." &c. *Ibid* Sec. 6.

And, in order to place the board in a position to fully carry out the objects and purposes of this enterprise, and "to furnish *resources* to

378 SUPREME COURT OF LOUISIANA.

State ex rel. R. R. Co. vs. Smith.

enable the said board to assist in developing, establishing and completing the levee system in the said district, all lands now belonging * * * to the State of Louisiana and embraced within the limits of the levee district as herein, shall be and the same are hereby granted, given, bargained, donated, conveyed and delivered unto the said board of commissioners," &c. *Ibid* Sec. 9.

For the purpose of enabling the board to raise additional funds, it was authorized to issue bonds to the amount of two hundred thousand dollars, the payment of which are to be "secured by taxes, and by sale of public and State lands"—said bonds to become due in thirty years. *Ibid* Sec. 10. ·

A careful inspection of the act discloses that no *specific* power or authority is given to the board of levee commissioners, to sell, or otherwise dispose of any, or all, of the lands which the legislature has *donated* to it; but that, on the contrary, the intention of the legislature is clearly and expressly stated to be that they were given to the board as a means of furnishing it with "resources."

And it is manifest from the entire scope of the act, that these lands were expected to supply the board with "resources" through the instrumentality of the ten mill tax, and the bond issue that is to be predicated thereupon.

The only mention that is made in the statute with reference to the power of the board to make sale, is found in the section which treats of the corporate powers with which the corporation is endowed, thus:

"The said board shall have authority to buy, and hold, or to sell and transfer titles to property; to make and execute contracts, and to do and perform any and all acts necessary to carry out the objects of this act." *Ibid* Sec. 4.

It is our appreciation of the statute, that the general assembly intended to create a levee district, and to place its government and control in the hands of a corporation, or board of levee commissioners; and that the purpose and object of said corporation was the perfection of a comprehensive levee system, and the protection of the entire territory within the district from overflow.

That in furtherance of that definite purpose and object, certain lands were donated to the board, in order that same might be made the basis of an annual *ad valorem* tax, and serve as a foundation upon which a thirty year bond issue might securely rest.

In our appreciation the ordinance, which proposes a sale of twenty

TERM OF 1900-1901.                379

State ex rel. R. R. Co. vs. Smith.

thousand acres, and more, of land—same being *all* the lands in the levee district, and, in fact, *all* the State had donated to the board for levee purposes—to a railroad company that has not yet completed its road-bed and superstructure, at the price of three cents an acre, the entire price only aggregating $610.00, is in direct conflict with, and in open violation of, the law which created the levee district and called the board of levee commissioners into existence.

The trend of same, in spirit if not in purpose or declared object, evidently is to presently and irrevocably divest the board of commissioners of its titles, and vest same in another and private corporation which owes no duty to the State; and by so doing, it, at the same time and by the same act, rendered itself completely impotent for the accomplishment of the purposes which the legislature reasonably expected it to accomplish—and provided same should be perfected.

But when we consider the further and still more important provision of same, to the effect that "the consideration of this sale (is) *not only* (three) 3 cents per acre, but the *advantages to the district of the building* of the Texarkana, Shreveport and Natchez Railroad by said company * * * between Shreveport and Texarkana, through the alluvial section of Caddo, and the speedy listing of said lands for taxation," our conclusions already stated in regard to the proposed disposition of *all* the lands in the district, are strengthened and confirmed; and it becomes quite apparent that the act of sale was only intended to effectuate a disguised donation of same to a private corporation in opposition to the purpose and clearly expressed intention of the legislature in making the donation thereof to the Caddo Levee District.

Being dispossessed of *all* of its lands, the board could neither assess and collect taxes nor issue bonds; and the vile price realized therefor was wholly inadequate for the purpose proposed to be accomplished.

In this situation of affairs, its sole reliance must be upon the very indefinite and equally inadequate promise of the relator; and this fully appears from a casual inspection of the ordinance and the law which created the board.

We have carefully examined the two leading cases to which our attention has been attracted as being decisively in favor of the relator, and upon which its counsel confidently rely for the affirmance of the judgment in its favor.

In State *ex rel.* Comerford vs. Mayor, 45th Ann. 269—it being one

of the cases cited—the following is given as a fair synopsis of the law of *mandamus* as it has been interpreted by numerous decisions of the highest courts in various States of the Union, viz:

"This writ will not lie unless the action desired is of absolute obligation on the part of the person sought to be coerced. The relator must show not only a clear legal right to have the thing done, but also a duty by the person sought to be coerced, in the manner sought, and that he still has it in his power to perform the duty required.

"The action must not only be in the respondent's power to do, but it must be his duty to do it. The act must be clearly prescribed and enjoined by law. The duty must be plain and positive."

In State *ex rel.* Banking Company vs. Auditor, 47th Ann. 1679, relators sought to compel the respondent, by a writ of *mandamus,* to perform a ministerial duty which was imposed upon him by a concurrent resolution of the general assembly, directing him to issue certain specified warrants in their favor; and the only defense seriously urged was the unconstitutionality of the law; and this court held that executive officers of the State government have no authority to decline the performance of purely ministerial duties which are imposed upon them by a law, on the ground that it contravenes the constitution.

Finding the act desired to be one of absolute obligation on the part of the respondent, and that the relators had a clear legal right to have the act performed, the court made the writ of *mandamus* peremptory.

But this is not such a case.

In State *ex rel.* Morris vs. Secretary of State, 43rd Ann. 590, the court had under consideration a *mandamus,* the object of which was to compel the respondent to promulgate as a law an enrolled bill which had been signed by all other officers designated by the law; and in the course of the opinion it was held that "the right of the secretary of State, under the provisions of Article 256 of the Constitution, and his return to a *mandamus* proceeding, to raise issues, *exclusively* appertaining to the *inherent* illegality of a proposed constitutional amendment, is very questionable, indeed, and consideration of them must be restricted to such as are *apparent and glaring."*

Again:

"Of course, the official journals import absolute verity, and form conclusive proof as to the proceedings themselves, when considered in reference to any *other* evidence of such proceedings; but the question

TERM OF 1900-1901. 381

State ex rel. R. R. Co. vs. Smith.

here is as to what *constitutes the journals,* and whether the printed journals have been made the actual repository of the proceedings of the two houses of assembly as they transpired.

"Do they truthfully represent what proceedings did take place, or do they contain misrepresentations of facts?

"It is quite clear to our minds that we should most certainly assume much too great and too grave a responsibility, and extend the doctrine of legal presumptions much too far, if we were to venture the assertion that legislative journals formed *conclusive* proof of legislative proceedings, and declined to entertain and consider evidence of unauthorized alterations and interpolations in the journals, whereby it could be made to appear that they did not faithfully and truthfully recite proceedings as they *did* transpire.

"The true distinction to be taken, in our opinion, is that no extrinsic proof is admissible to contradict the *facts* which are established by the journals; but fraud, error, mistake, or the improper exercise of judgment, on the part of a State agent, or representative, existing *intrinsically,* may be shown.

"This is not a question of what proof is furnished by the journals as contra-distinguished from *other* proof of a given state of facts; but it is a question of the journals being, in themselves, a correct exposition of the facts as they happened."

That, in our opinion, is quite a parallel case to the instant one.

In State *ex rel.* Bienvenu vs. Secretary of State, 17th Ann. 156, the court had under consideration a *mandamus* to compel the respondent secretary of State to affix his official signature and seal of office to a commission which had been signed and issued by the governor of the State to the relator as sheriff of the parish of Orleans; and the return of the respondent was that the commission was null and void and of no force, because the governor was without warrant of law to issue it, and he can not be compelled to lend his sanction to the same by countersigning such illegal commission—his contention being that one Alfred Shaw was holding and exercising the office under a commission which did not expire until the next regular election for sheriff; and that the governor was without power or authority to supersede said Shaw by appointing Bienvenu. On consideration of the authorities, the court held that "the secretary of State can not legally go behind the commission issued by the governor, in due form, to Bienvenu, and examine into the facts upon which the executive's action was predicated."

The court further held that "the signing of the commission by the governor of the State is an official duty imposed on him by the constitution; it emanates from the executive's authority, and is issued from the proper office.

"The governor is by the constitution vested with the exclusive power to make some, and, under certain contingencies, other official appointments, and such appointments are official acts.

"He must determine for himself from information communicated to *him* when appointments become necessary; but he is under no legal obligation to communicate either to the secretary of State, or to any one else upon what information he acts.

"The secretary of State is not to suspend action to inquire why and wherefore any appointment by the governor of the State is made.

"His duty is plain; he is not directed, but ordered by law, to perform it. When commissions from the governor need authentication, he shall affix his official signature and the public seal of the State, for these are official acts. Whatever improvidence or illegality there may be in the issuing of commissions, that concerns not him. His authenticating any official act can never compromise him, for he has no discretion to exercise regarding it."

That decision is instructive in view of the fact that it draws a clear line of distinction between the case under consideration by the court and that in Morris vs. Secretary of State. In considering the scope of the writ of *mandamus* in this case, it must be borne in mind that the case comes to us on appeal; and that, therefore, this court is exercising its appellate, and not its supervisory jurisdiction. On this subject, the court said, in State *ex rel.* Moyse vs. Judge, 50 Ann. 492, that "it is quite apparent that the judges of the District Court fulfill all the requirements (of the Code of Practice); and it is manifest that the power of these judges is not limited to cases wherein the writ comes in aid of their appellate jurisdiction, but extends to all classes of causes because they are judges of the courts which exercise appellate jurisdiction as well as ordinary civil jurisdiction"—the province of the writ being to command judges of the inferior courts and other public officials to render justice and perform the duties of the offices conformably to law.

Code of Practice 837.

Comparing the principles announced in those cases, we find that in

State *ex rel.* Morris vs. Secretary of State, this court recognized the right of the respondent to test by his return to the *mandamus* the perfection and completeness of a legislative act in respect to its having passed through all the formal proceedings requisite to its promulgation as a law; whilst in State *ex rel.* Banking Company vs. Auditor, this court declined to recognize the right of the respondent to test in his return the validity of a complete and perfect legislative act, on the ground of its unconstitutionality—holding that the parties interested only could do this in a contradictory proceeding.

Applying those principles to the instant case, we are of opinion that the respondent as president had a perfect legal right in his return to test the authority of a majority of the board of levee commissioners to adopt a resolution, which upon its face and its terms, imports a donation in disguise to a private railroad corporation, and *ultra vires*—and the adoption of which was resisted by a minority thereof, including the respondent, on those grounds—and decline to put same into operation until the court should decide the question.

The resolutions of a *quasi* political corporation, such as a board of levee commissioners, created by special legislative enactment for designated public purposes—like the ordinances of a police jury—do not import absolute verity like the statutes of the State, because they are not admissible in evidence until authenticated by proof, and are not self-operative.

Such a resolution can not be held to import absolute obligation on the part of such a board, or confer upon the private corporation dealt with "a clear legal right" to have the act completed by *mandamus.*

At most, the resolution is a mere promise of sale which may entitle it to an action to compel a specific performance, or the payment of damages.

Whilst this court appreciates the care and sound judgment which invariably characterize the decisions of our distinguished brother of the district bench who decided this case in the first instance, it feels entirely persuaded that the relator has not stated a case entitling it to have the decree in its favor affirmed; but, on the contrary, it has, upon a careful study and consideration of the important and far-reaching issues involved, arrived at the deliberate conclusion that it is not entitled to the relief that is demanded.

The judgment appealed from must be reversed.

It is, therefore, ordered and decreed that the judgment which is ap-

pealed from be annulled and reversed; and it is further ordered and decreed that the preliminary writ herein granted be set aside, and that the demands of the relator be rejected at its cost in both courts.

Mr. Justice BLANCHARD, concurring, expressed his views orally from the bench.

The Chief Justice dissents, and reserves the right to file his reasons hereafter.

Mr. Justice MONROE dissents from the view entertained by the majority of the court that the respondent is competent to raise the issues upon which the decision rests.

Rehearing refused.